## Eberts *versus* Eberts.

1. The admissibility of a copy of a record is to be determined alone by the official certificate. If that purports to be a full and entire copy, as fully as the same remains in the office, it must be admitted.

2. Such exemplification will be evidence although all the papers which compose the record may not appear on the face of it.

3. But it will be evidence only so far as it goes; the necessary papers, if important to the effect of the proof, must be accounted for, to supply them by secondary evidence if needful.

4. The interest of a husband, after proceedings in partition, of real estate of which his deceased wife is one of the heirs, is real estate.

5. Where a guardian buys his ward's estate shortly after he comes of age, for a price greatly inadequate and without settling an account, the transaction would be set aside as fraudulent.

6. Such transaction would be evidence of fraud *per se.*

7. Great inadequacy of price, as between guardian and ward, will avoid the sale or release of the ward, because it is itself evidence of fraud and will stand so, unless overruled by proof to the contrary.

8. A guardian is never allowed to make money out of his ward: if any be made it must be accounted for.

9. Improvements put by a guardian upon land fraudulently purchased from the ward, are not to be reimbursed. And if put on by him as guardian without an order of the court, it is at his own risk.

March 20th 1867.    Before WOODWARD, C. J., THOMPSON, STRONG and AGNEW, JJ.    READ, J., absent.

Error to the Court of Common Pleas of *Carbon county.*

In the court below, Jonas Eberts and Jacob Garber, and Lavina his wife, in her right, on the 20th of January 1865, brought an action of ejectment against Joseph Eberts and others, executors, &c., of Jacob Eberts, deceased, for a tract of land containing 150 acres. The land in dispute was originally the property of George Giffie, who died about the year 1811, leaving three children, daughters, who were then minors under the age of 14 years; one of whom, named Lydia, was afterwards married to Jacob Eberts, the defendants' testator.

On the 20th of August 1824, upon the petition of Eberts, the Orphans' Court awarded an inquest to value or divide the above-mentioned real estate, of which Giffie died seised. The inquest returned that they had valued the land at $687.50. The wife of Eberts having died, leaving two children, the plaintiffs, minors, under the age of 14 years, Eberts was on the 12th of January 1827 appointed their guardian. On the 12th of April Jacob Eberts, as guardian of these children, accepted the land of Giffie at the valuation. "Whereupon the court adjudged the same to the said Jonas Eberts and Lavina Eberts, their heirs and assigns for ever, as tenants in common, &c., upon the said Jacob Eberts, guardian as aforesaid, entering into recognisance for the payment of the shares and dividends of the other children of the said intestate, of and in the valuation."

[Eberts v. Eberts.]

"Jonas Eberts and Lavina Eberts, by their said guardian, Jacob Eberts," entered into recognisance to the Commonwealth for the payment of the shares of the other heirs of Giffie. Eberts paid the shares of the other children of Giffie, some of the receipts for the shares being to him as guardian and some as an individual. He afterwards moved on to the land and married again. He filed no inventory of his ward's estate, nor settled any account of his guardianship.

The children afterwards executed the following instrument, being then respectively of the ages of 24 and 22 years:—

"Know all men by these presents, That we, Jonas Eberts and Lavina Eberts, now the wife of Jacob Garber, all of Mahoning township, Carbon county and state of Pennsylvania, do hereby acknowledge that we have had and received of Jacob Eberts, our guardian, the sum of $366, in full satisfaction and payment of all such sums or sum of money, share, proportion and dividend which were due and belonging to us by any means whatsoever, for or on account of our full share of the real estate of George Giffie, deceased. And therefore we, the said Jonas Eberts and Lavina Eberts, now the wife of Jacob Garber, do by these presents, release, acquit and for ever discharge the said Jacob Eberts as guardian, &c., his heirs, executors and administrators, of and from the share, our full share and dividend of the real estate aforesaid, and of and from all actions, suits, payment, accounts, reckonings, claims and demands whatsoever for or by reason thereof, or of any other act, matter, cause or thing whatsoever, from the beginning of the world to the date of these presents. In witness whereof we have hereunto set our hands and seals, this 24th day of February 1846."

They executed also the following instrument:—

"Know all men by these presents, That we, Jonas Eberts, Jacob Garber and his wife Lavina, are held and firmly bound unto Jacob Eberts, of Mahoning township, county of Carbon, in the sum of $42.37, lawful money each, to be paid to the said Jacob Eberts, his certain attorney or assigns, to which payment, well and truly to be made, we bind ourselves and each of us, our heirs, executors and administrators, jointly and severally firmly by these presents. Sealed with our seals. Dated the 5th day of January, A. D. 1850.

"Whereas, George Giffie became in his lifetime lawfully seised of a certain tract or piece of land, situate in Mahoning township, county of Carbon, and being so thereof seised, died. And whereas, Jacob Eberts aforesaid having taken the said lands of George Giffie aforesaid at a valuable consideration, and having also been lawfully married to *Sophia*, daughter of said George Giffie, which said *Sophia* had a sister named Eve, second child of George Giffie aforesaid, and said Eve having been absent for about twenty

years, and, as reported, died without issue.   And whereas, said Jacob Eberts aforesaid having paid unto said Jonas Eberts, and Lavina Eberts, wife of Jacob Garber aforesaid, each his and her full share which they would be entitled to as heirs of the said Eve Giffie, from the estate of her father, George Giffie aforesaid, the sum of $21.18½ each, the receipt of which is hereby acknowledged. Now the condition of this obligation is such, that if the above bound Jonas Eberts, Jacob Garber and his wife Lavina shall and will, from time to time and at all times hereafter, well and sufficiently keep, save harmless, and indemnify the above-named Jacob Eberts, his heirs, executors and administrators, and every of them, from all suits, costs and charges whatsoever that shall and may accrue to him or them by reason of said Eve Giffie, or any person for her, then this obligation to be void, or else to be and remain in full force and virtue."

There was evidence that Eberts put buildings on the land and otherwise improved it, also of his having received a small amount of rent, and having sold produce and timber from it.   Witnesses stated the value of the land at the date of the release in 1846, variously at from $10 to $25 per acre ; there was proof also of declarations of Jonas Eberts and Garber, the husband of the daughter, as to their knowledge before executing the release of 1846, that it would pass their interest in the land to their father. Jacob Eberts had a number of children by his second marriage. By his will, proved October 13th 1864, he directed his executors to sell this land ; he gave nominal legacies to the plaintiffs, and gave all the rest of his property to his children of the second marriage.

On the trial, before Barrett, P. J., exemplifications of the records of the Orphans' Court in the above proceedings were offered by the plaintiffs.   The certificate of the clerk to one was: "That the foregoing is a correct exemplification of the whole of the record and proceedings of the said court relative to the real estate of George Giffie." ·

Of another : " That the foregoing is a true and correct copy of the recognisance taken of Jacob Eberts, guardian of Jonas and Lavina Eberts, minor children of Lydia Eberts, deceased, in the matter of the acceptance of real estate under proceedings in partition in said court, as the same now remains on file, and of record in my said office."

Of the third : " That the above and foregoing proceedings for the appointment of Jacob Eberts, guardian of Jonas Eberts and Lavina Eberts, is a true and correct copy of the original, as full and entire as the same remains of record in said office."

The admission of the records was objected to as being imperfect, and showing on their face that part of the proceedings were not contained in the copies, and therefore they were not " full and entire.'

[Eberts *v.* Eberts.]

The court overruled the objections, admitted the evidence and sealed a bill.

The plaintiffs amongst others, submitted the following points :—

6. If the jury believe that the land in controversy was of considerably greater value at the execution of the release than the amount which was paid for the release by Jacob Eberts to his wards, the release is inoperative as a conveyance, and the verdict must be for the plaintiffs.

10. If Jonas and Lavina Eberts did not know in 1846, at the date of the alleged release, that they were the owners of the land, Jacob Eberts, their guardian, was guilty of actual fraud in withholding from them that information, and the release is therefore void as a conveyance of the land.

11. If Jacob Eberts, by acts or declarations, induced his wards to believe that they were not the owners of the land, but only of a share or sum of money coming from, or charged upon the lands, he was guilty of actual fraud, and could acquire no equities against them to be reimbursed for any expenditures for improvements upon the lands, or for purchase-money paid.

12. In the absence of any evidence to the contrary, the law presumes that any payments made by Jacob Eberts for improvements or purchase-money during the continuance of the trust, were made with money in his hands belonging to his wards ; and this presumption is greatly strengthened by the fact that during all the period of his guardianship, he received all the profits of the land.

13. The improvements made by Jacob Eberts during the continuance of his trust, being made without authority of Orphans' Court, enured to the benefit of the land, and could not operate either to confer upon him a right to reimbursement, or to vest in him any estate in the land, at law or in equity.

All which were confirmed.

The defendants submitted amongst others, the following points :—

5. When *cestui que trusts* seek relief from the operations of contracts entered into with their trustees, application for relief must be made within a reasonable time, and courts will refuse to set aside a purchase in which the *cestui que trusts* have acquiesced for any considerable period of time.

To which the court answered : " Affirmed if fair and with full knowledge of their rights."

6. At the time of executing these releases the plaintiffs were of full age, and an acquiescence for nearly twenty years by the plaintiffs in the enjoyment of these lands by Jacob Eberts under these releases, operates as a bar to these suits.

7. These papers called releases must be regarded as a covenant for the sale and release of the interest of the children to the father,

5 P. F. SMITH—8

Jacob Eberts, and a covenant not to sue for any interest which they may have had in the lands.

8. That Jacob Garber having married his wife Lavina, prior to the Act of April 11th 1848, he was tenant by the curtesy initiate, and as such was entitled to a life estate in his wife's share of these lands, and the releases must be regarded as a covenant for the sale and release of his life estate in these lands, and that neither Jacob Garber or his wife can recover in this suit.

9. That Jacob Eberts was a tenant by the curtesy and entitled to an estate during his life for that one-third part of the real estate which descended to his wife on her father's death, and which was not converted into personalty by the proceedings in the Orphans' Court, and was at the date of this release a tenant in possession holding a life estate of the one-third of the real estate.

The 6th, 7th, 8th and 9th points were denied.

The court, after stating the facts and reciting the release, charged :—

" This is the language of the paper itself. Being a written contract its construction is for the court. [It is not a deed of conveyance for the land which they owned. If it relates to the land, and was intended to embrace it, it was only a contract. Giffie owned no other land, and perhaps the fair inference would be that the parties intended to embrace the farm on which Jacob Eberts resided. We shall therefore treat it as a contract for the land, and this is the most favorable aspect for the defendants in which it can be viewed. The parties were then competent to contract, and a valuable consideration passed. If the contract was a fair one ; if the parties understood their rights ; if no misrepresentation or deceit was used in obtaining it; if it was untainted by fraud, then it is a good, valid and binding contract. Was it a fair contract considering the relation in which the parties stood to each other ? This is a question of fact for the jury. Did Eberts as their guardian inform them that they were the owners of the farm ? This he was bound to do, and the burden of proof is on those who claim under him to show that he did do so. Is there any evidence of his proposing to purchase the land from them ? Did he speak of the improvements he had made ? Did he offer to account for the profits, or did he treat the land as his own, and propose to pay to his wards their proportion of the valuation placed upon it in 1826 ? Eberts was bound as the guardian of those children, to act fairly and honestly towards them ; to inform them of their rights, and see that they were protected in them. If the evidence is believed, the money paid was not the one-sixth of the real value of the property at the time when the contract was made. This in itself was unjust and unfair, if the wards of Eberts were not apprised of their rights. If they

[Eberts v. Eberts.]

were, it was their privilege to fix their own value upon the property. It will not do to say that the father raised these children, and that the cost of so doing should be considered; that he was bound to do by law. Nor that he made improvements on the farm—that was done at his own risk; nor that he paid the other heirs their shares of the appraised value. In the absence of all evidence on the subject, the law presumes that he paid it with their money. Besides he may have been reimbursed for all these payments and expenses, from the profits of the land while he occupied it. Eberts could have filed his account as guardian, and that would have shown the management of the estate.]

" This is a contest between the two sets of children. Those by the second wife claim under the will of their father. Those of the first wife are excluded by the will, and claim in their own right.

" A simple question of fact goes to the jury. If the paper of the 24th of February 1846 was fairly procured and intended by the parties to be a sale of the land to Jacob Eberts; if Jonas Eberts and Lavina Garber executed it with a full knowledge of their rights, then your verdict should be for the defendants.

" If on the contrary it was unfairly procured; if it was procured by concealment, misrepresentation or fraud, or by any undue influence arising from the relation between the parties, or by withholding from plaintiffs knowledge which Jacob Eberts was bound in law to give to them, then the plaintiffs are entitled to the land, and your verdict should be in their favor."

There was a verdict for the plaintiffs.

The defendants assigned for error the admission of the evidence objected to, the answers of the court to the several points given above, and that part of the charge included in brackets.

*C. Albright* and *M. Dimmick*, for plaintiffs in error, cited Ingham *v.* Crary, 1 Penna. R. 389; Buchanan *v.* Duncan, 4 Wright 82; Fogelsonger *v.* Somerville, 6 S. & R. 271; Johnson *v.* Matson, 1 Penna. R. 371; Stoolfoos *v.* Jenkins, 8 S. & R. 175; Kean *v.* Ridgway, 16 Id. 63; Snevily *v.* Wagner, 8 Barr 398; Act of 19th April 1794, 3 Sm. L. 143; Mann's Appeal, 14 Wright 375; Acts of 29th March 1832, Purd. 292, pl. 124 *et seq.*, Pamph. L. 201, and 24th February 1834, § 46, Purd. 291, pl. 113, Pamph. L. 82; Brink *v.* Michael, 7 Casey 165; Fulton *v.* Moore, 1 Id. 468; McCullough *v.* Irvin, 1 Harris 438; Woods *v.* Wilson, 1 Wright 379; Arnold *v.* Cornman, 14 Id. 361; Wilson *v.* Bigger, 7 W. & S. 126; Smith *v.* Warden, 7 Harris 425, 430; Gratz *v.* Beates, 9 Wright 496; Davidson *v.* Little, 10 Harris 250.; Harris *v.* Tyson, 12 Id. 347; Pearsoll *v.* Chapin, 8 Wright 9; 1 Am. Lead. Cas. 162, 168, note; Barton *v.* Wells,

[Eberts *v.* Eberts.]

5 Wh. 227; Hill on Trustees 853, 854; Pennell's Appeal, 2 Barr 216; Bonsall's Appeal, 1 Rawle 266; Chorpenning's Appeal, 8 Casey 315; Bones's Appeal, 3 Id. 492; Hill on Trustees 802–811; Kendrick *v.* Smick, 7 W. & S. 45; Ogden *v.* Brown, 9 Casey 247; Colt *v.* Selden, 5 Watts 525; McFarson's Appeal, 1 Jones 503; Gray *v.* McCune, 11 Harris 447; Shepherd's Touchstone 327, 450; Act of May 28th 1715, § 5, Purd. 321, pl. 74, 1 Sm. L. 95; McKee *v.* Pfout, 3 Dallas 486; Dunwoodie *v.* Reed, 3 S. & R. 445; Sergeant Land Law 230–242; Story's Eq. Jur. 340, § 309, note, 348, 354; Beeson *v.* Beeson, 9 Barr 286, 287; Gregory *v.* Gregory, 1 Cooper's Ch. Cas. 201; Bergen *v.* Bergen, 1 Caines' Cas. 1–20; Hawley *v.* Cramer, 4 Cowen 743; Coke Litt. ch. 8, § 508; Crawford *v.* Hunter, 8 Rep. 154; Brook's Ch. 67; Kirkham *v.* Shawowp, 6 Tenn. 15; McWilliams *v.* Martin, 12 S. & R. 271.

*H. Green*, for defendants in error, cited Voris *v.* Smith, 13 S. & R. 334; Edmiston *v.* Schwartz, Id. 135; Harper *v.* Farmers' and Mechanics' Bank, 7 W. & S. 204; Ingham *v.* Crary, 1 Pa. R. 389; Clark *v.* Depew, 1 Casey 509; Gelbach's Appeal, 8 S. & R. 205; 1 Story's Eq. § 218; 1 Lead. Cas. in Eq. 169, notes to Fox *v.* Mackreth and Pitt *v.* Mackreth; Say's Exrs. *v.* Barnes, 4 S. & R. 114; Elliott *v.* Elliott, 5 Binn. 8; Lukens's Appeal, 7 W. & S. 48; Stanley's Appeal, 8 Barr 433–434; Will's Appeal, 10 Harris 332; Hawkin's Appeal, 8 Casey 264–5; 1 Lead. Cas. in Eq. 158; 1 Story Eq. Jur. § 246; Davidson *v.* Little, 10 Harris 252; Hunt *v.* Moore, 2 Barr 107; Jackson *v.* Summerville, 1 Harris 359; Gilbert *v.* Hoffman, 2 Watts 66; Smull *v.* Jones, 1 W. & S. 138; Duncan *v.* McCulloch, 4 S. & R. 485; Chamberlain *v.* McClurg, 8 W. & S. 36; Miller's Appeals, Wilhelm's Appeals, 6 Casey 478; Smith *v.* Loader, Prec. in Chanc. 80; Beeson *v.* Beeson, 9 Barr 279; Miller's Estate, 1 Id. 326; Snodgrass's Appeal, 1 Wright 377.

The opinion of the court was delivered, May 13th 1867, by

THOMPSON, J.—The 1st and 2d assignments of error relate to the reception in evidence of the exemplifications of certain records therein set forth. It is too well settled to need a reference to authorities to prove that the admissibility of such copies is to be determined alone by the official certificate. If that purports that an exemplification is a full and entire copy of the record, as fully as the same remains in the office, it must be admitted: Edmiston *v.* Schwartz, 13 S. & R. 135; Voris *v.* Smith, Id. 334; and Harper *v.* The Farmers' and Mechanics' Bank, 7 W. & S. 204.

When the certificate is thus full, the exemplification will be

evidence, notwithstanding all the papers which usually compose such records may not appear on the face of it, as Voris v. Smith, *sup.*, shows. It will be evidence, of course, only so far as it goes. The missing papers, if important to the effect of the proof, must be accounted for, in order to supply them by secondary evidence if needful. We think the exemplifications in this case were properly received, and the exceptions to their admission are not sustained.

We learn from them that Jacob Eberts, deceased, the father of the plaintiffs below, and the father and testator of the defendants, was appointed guardian of the former by the Orphans' Court of Berks county, on the 26th of August 1826, on account of an interest in them, derived through their mother in the real estate of George Giffie, deceased, their grandfather. That he qualified as such, and in the proceedings in partition of the real estate of the said George Giffie, he accepted the same at the appraisement, and entered into recognisance as guardian for the payment of the shares at the appraised value to the other heirs; the court having decreed the land to the said minors. The evidence in the case shows that these shares were subsequently paid by the guardian, and so receipted or released to him. After the acceptance of the land, Eberts, with the children, then very young, moved on the land. This was in 1826 or 1827, and he continued to reside on it and improve it till his death, some time in 1864, never rendering any account of profits or expenses, as guardian or otherwise. He married a second time, and raised a large family; and in 1864 he made a will and devised the land in controversy, with his other property, among the children of his second marriage, and the defence below is upon the title of Jacob Eberts to the land.

It is claimed that he acquired a complete title by virtue of the release given in evidence, and executed by the two children, his wards. The court below treated the release as applicable and operative on the interests of the wards if fairly and honestly obtained, in view of the existing relations between the parties. Without finding fault with this, we think it was as favorable a view for the defendants of the instrument as could well have been expected. Most of the material assignments of error have relation to this release, and we shall only notice those in this opinion which strike us as being most natural, without regard to the order in which they are presented in the paper-book.

In the 6th assignment of error it is claimed that the court was wrong in giving a negative response to the defendant's 9th point, which claimed that the testator was tenant by the curtesy in his wife's land; that it was not changed into personalty by the proceedings in partition.

The object of the point was to establish in him such an interest

[Eberts *v.* Eberts.]

as would sustain a release in his favor by the heirs.   We agree
that his interest was real, not personal, and that in strictness the
point should have been answered the other way ; but the answer
did the defendants no injury, for in response to the 1st and 4th
points of the defendants, the release was distinctly held to be
good and valid to bar the plaintiffs, if it was given by the releasors
with a full understanding of their rights, and without fraud or
concealment on the part of the guardian, the releasee.   This was
the ground occupied by the court upon the validity of the release
from first to last.   The jury was, over and over again, told that
it was on this ground that the release was to be considered invalid,
if invalid at all.   If all was fair, it was valid ; if advantage had
been taken of the ignorance and want of knowledge of the heirs,
it was invalid:

The case went to the jury on this issue.   There was not a syl-
lable to indicate to them that the release was void because no
estate existed in the release to be enlarged by the release.

The guardian was, as contended for by the defendant, tenant
by the curtesy.   This being so, the plaintiff could not have
ejected him from the land.   His title to the possession was good
to the extent of one-third for life, and this, together with the
existing relationship between the trustee and his *cestui que trusts,*
might all be considered where delay and apparent acquiescence
were urged against them, as persuasive evidence of satisfaction
with the transaction now contested.   It would not conclude the '
heirs, unless it was of such a character as to be a fraud upon him,
and if so they were estopped.   In favor of innocent parties, ac-
quiescence under knowledge by a party having a right, that money
is being expended, on the belief that he has parted with his title,
is sometimes conclusive against such party.   But it has no place
in this case, as it was tried, further than to lead to a presumption
of satisfaction with the release.   This presumption would only
stand until rebutted by facts showing bad faith, fraud or conceal-
ment imputable to the guardian, and that was the great point
of the case.

The guardian was not ignorant of what kind of title he held
and how he had acquired it.

If obtained unfairly, in his relation, or by concealment, he
knew it, and he was not an improver in ignorance of his rights, and
therefore not entitled to require prompt action.   The court, how-
ever, affirmed the defendant's 3d point on the subject of acquies-
ence in the release by the heirs, " provided it was fair and with full
knowledge of their rights."   Nothing better than this could have
been said of an honest transaction ; if it was not defensible on
this ground, it certainly was not on any other.

The negative answer to the 5th point was correct.   The release
was neither in form nor substance a covenant not to sue for an

interest in the land which the heirs were entitled to. Had it been so in form, it would have been quite as assailable as the release. Besides, its effect might not have been as effectual. But we need not discuss this, for the release was held by the learned judge to be a bar to a recovery by the plaintiffs, in the absence of fraud. That was the only thing in the way of its conclusive operation. It was sufficient in form, according to the learned judge, and the releasee had an estate to be enlarged by a release, according to the charge. It was perfectly effective, if honest. There was therefore no necessity for asking for it any different or other character than that conceded to it.

The plaintiff in error also complains of the answer to the 8th point of the plaintiffs below. It was in substance, that if the consideration for the release was greatly inadequate as a consideration for the subject of it, the release would be inoperative as a conveyance, and the verdict should be for the plaintiffs.

It must be remembered that from first to last, the case was put to the jury on the question of fraud and full knowledge or otherwise on part of the releasors of their rights; and this answer, if objectionable, must be regarded as subordinate to the instruction already given on that aspect of the case. But was it error in any aspect? A guardian buys his ward's estate shortly after he or she becomes of age for the one-sixth, as here, of its value, and without settling any account; would not any court set aside such a transaction on such inadequacy being shown? Undoubtedly they would; they would do it by characterizing the transaction as fraudulent. It would be evidence of fraud *per se*, unless under very peculiar circumstances. In Wills's Appeal, 10 Harris 332, it was said in a case of this kind, "a written release directly to the guardian, executed with all due solemnity by the ward, after he comes of age and without a perfect knowledge of his affairs, will not stand a moment in any court of equity, unless it can be proved that the consideration he received was a *full equivalent for the right given up*," per Black, C. J. "A court of justice will not permit such transactions (a release by a ward to her guardian) to stand unless the circumstances demonstrate in the highest sense of the term full deliberation and *uberrima fides :*" Woodward, J., in Hawkins's Appeal, 8 Casey 263.

The plaintiffs in error would probably have looked at the proposition and answer of the learned judge with more allowance, had it been in form what it was in substance, that, as between guardian and ward, great inadequacy of price will avoid the sale or release of the latter because it is itself evidence of a fraud, and will stand so unless overruled by proof of the contrary.

A guardian is never allowed to make money out of his ward. If any be made, it must be accounted for. Yielding anything on this point is giving up everything. The vulture and the lamb

[Eberts *v.* Eberts.]

would symbolize the relation of guardian and ward better than anything else if the courts should learn to look with leniency on contracts of the kind we have before us. I do not think there was error in the answer, and that it is sustained on both grounds. The release of the land in question, if it be such, was in consideration of $366 for a property variously estimated, at the time, to have been worth from two to five thousand dollars.

There is a complaint that a recovery was allowed in the absence of reimbursement for payments made to extinguish the interest of the other heirs. The defendants did not put their case on that ground, but stood upon their legal title. Yet the plaintiffs below opened the question by propounding the 11th and 12th points; and they gave testimony to show that the testator derived large profits from the products of the farm and in the sale of timber. No doubt the jury thought this was sufficient compensation or reimbursement. But if the transaction was a fraud, everything based upon such foundation would go down with the fraud. The improvements on the place were at the guardian's risk if he chose to put them there with his own money. If for the benefit of the wards without the order of the Orphans' Court, it was at his own cost. If it be not so held, a guardian might improve his wards out of their property. By transacting the business as the law requires, no injury would have befallen anybody. There is a place for and a mode of settling all accounts between guardians and wards; but if a guardian prefer another mode and place of settlement than in the Orphans' Court, he ought to expect, for he will be almost certain to experience, trouble and vexation in consulting his own individual preference.

Here the guardian never settled any account with his wards in court, nor exhibited any to them at any time, nor did he explain to them, so far as the testimony discloses, what interest they had in their mother's estate.

As to the two-thirds taken by and decreed to the wards, the title was in them by the decree of the Orphans' Court, and their guardian could not, after that, acquire title to himself by any conveyance these heirs who owned them could make to him, unless with full knowledge of their rights. But I will not pursue the investigation further.

We see no errors which require correction in the case. It seems to have been fairly tried, and the concluding sentence of the charge shows the grounds upon which the case was decided. "A simple question of fact," said the learned judge, "goes to the jury. If the paper of the 24th of February 1846 was fairly procured and intended by the parties to be a sale of the land to Jacob Eberts; if Jonas and Lavina Garber executed it with a full knowledge of their rights, then your verdict should be for the defendants. If on the contrary, it was unfairly procured;

[Eberts *v.* Eberts.]

if it was procured by concealment, misrepresentation or fraud, or by any undue influence arising from the relation between the parties, or by withholding from plaintiffs' knowledge which Jacob Eberts was bound in law to give them, then the plaintiffs are entitled to the land, and your verdict should be in their favor." Every other instruction was subordinated to this, with the full sanction of the court, that the paper was sufficient to convey title if it was not a fraud. This gave the defendants as good a chance as they could reasonably demand. As we see no error in the record, the judgment is affirmed.