58       304
23 SC ²435

# The Schuylkill and Dauphin Improvement and Railroad Co. *versus* McCreary and Jones.

1. An exemplification of a record of a judgment and a sheriff's sale under it, not containing the fi. fa. and the levy and inquisition was certified to be as full and entire as it remained upon record. *Held*, to be admissible in evidence.

2. The acceptance of a deed by a grantee makes its recitals evidence against him ; but not against a bonâ fide purchaser from him without notice.

3. The sale of the land of a defaulting tax collector, by a warrant from the county commissioners, under the Act of April 11th 1799, is not a sale for taxes, and the laws relating to sales of unseated land are inapplicable.

4. It is not an objection to such sale that it is not made on the day named in the warrant. The warrant has no return day, but is effectual as long as the commissioners may choose.

5. If irregular, no one but the defaulter could take advantage of it.

6. The commissioners could buy the land through an agent, take a deed for it for the benefit of the county, and lease or sell it at their pleasure.

[Schuylkill and Dauphin Improvement Co. v. McCreary.]

7. A tenant holding over continues tenant, and his possession is that of his lessor, so far as relates to the Statute of Limitations.

May 27th 1868, at Harrisburg. Before THOMPSON, C. J. STRONG, READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Northampton county*. No. 130, to January Term 1866.

This was an action of ejectment brought the 24th of September 1849, in the Court of Common Pleas of Schuylkill county, for a tract of land in Tremont, Frailey and Porter townships in Schuylkill county, containing 170 acres, surveyed on warrant in the name of John Lesher, bounded by lands in the name of Nancy Kinnear, Michael Binninger, John Moyer and others. The plaintiffs were the President and Directors of the Williams Valley Railroad and Mining Company, and the defendants John Schall, Andrew J. Jones, John Rohrer and Samuel Kimmel, terre-tenant. The writ was served on Schall and Kimmel only. The name of the plaintiffs was afterwards changed to "The Schuylkill and Dauphin Improvement and Railroad Company. The interests of Rohrer and Schall subsequently became vested in John B. McCreary; he and Jones were the defendants at the time of trial. By an Act of Assembly of March 17th 1864, the case was removed for trial into the Court of Common Pleas of Northampton county, where it was tried in October 1865, before the Hon. J. W. Maynard, P. J.

The plaintiff gave in evidence a warrant to John Lesher, dated November 3d 1794, for "170 acres, including an improvement on Broad Mountain between Pinegrove township and Pine Creek, in the county of Berks." Survey May 5th 1785, for 144 acres and allowance. Deed March 16th 1797, John Lesher to Ludwig Schwartz, for the same tract, recorded in Schuylkill county June 8th 1840. Patent to Schwartz February 25th 1803. Deed March 31st 1837, Schwartz to John Snavely for same tract, recorded in Schuylkill county June 8th 1840. By divers conveyances the title of Snavely was vested in the plaintiffs in December 1839.

The defendants gave in evidence the application, warrant and survey to Lesher as above.

They then offered a copy of a record of a judgment against C. Bartsche in the Common Pleas of Berks county, with certificate that it was "as full and entire as the same remains of record at the time of the certificate," with evidence that C. Bartsche was in possession of the land in question at the time of the judgment, that it was taxed to him, and that his possession was transmitted, by sheriff's sale, to William Green, under whom the defendants claim. The offer was objected to by the plaintiffs as containing neither the writ of fi. fa., levy nor inquisition. The evidence was admitted and the first bill of exceptions sealed. The

8 P. F. SMITH—20

record showed a judgment, G. Burckhard *v.* Christian Bartsche, Jr., entered April 26th 1806, for 93*l.* 13*s.* 5*d.* Fi. fa. and vend. ex. and return " property sold." The property is described as a tract of land situate in Mahantongo township, Berks county, adjoining Peter Smith, Klinger and others, containing 700 acres, late the estate of Christian Bartsche, Jr. Sheriff's deed to William Green, dated January 6th and acknowledged April 17th 1807, for land as described in the writ sold September 22d 1806, for 109*l.* 5*s.* The defendant further gave in evidence deed of August 13th 1801, J. Meyer to Christian Bartsche, for 400 acres, surveyed on a warrant to John Witman July 1st 1793, adjoining Michael Binninger and others; also, articles, February 24th 1807, between William Green and Joseph Keffer, innkeeper, by which Green agrees to convey to Keffer on the 8th of April next, 700 acres in Mahantongo township, now in the possession of Peter Minnich. Also, endorsed on sheriff's deed to Green; deed October 4th 1810, from Green to Keffer, for " a valuable consideration," " the within mentioned and described tract of land containing 700 acres ;" recorded in Schuylkill county August 14th 1854.

The defendants further offered deed from John Bartsche to Ludwig Schwartz dated August 14th 1806, with evidence that this deed was in possession of L. Schwartz who handed it to his son S. Schwartz who sold the land to J. Snavely; that the deed went into the possession of the president of the plaintiffs and whilst there the date was changed from 1806 to 1805; that deed of December 6th 1803, from Schwartz to C. Bartsche, and from C. Bartsche to J. Bartsche (both recited in deed offered), passed into the hands of the plaintiffs. The offer was objected to, admitted, and the second bill of exceptions sealed. The deed as given in evidence appeared to be dated August 14th 1805, acknowledged same day; it conveyed to Schwartz a tract of land called " Amsterdam," situated on Broad Mountain in Mahantongo township, Berks county, containing 144 acres and allowance, the same granted to Ludwig Schwartz by patent of February 25th 1803, and by Schwartz conveyed, December 6th 1803, to C. Bartsche and by C. Bartsche to J. Bartsche on the " 9th of August *instant.*"

The defendants called F. K. Schwartz, the grandson of Ludwig Schwartz and son of Samuel Schwartz, who died in 1842 before Ludwig. He testified that the deed was in Samuel's possession at the time he, Samuel, went to sell the land to Snavely, and continued there until his death; that William Ayres, who was then president of the company, called on witness frequently to know whether he had papers relating to the Lesher tract—he gave Ayres the deed; about three years before his death there was another deed passed with this which had reference to the same lands, the contents something similar but parties different; the patent was with the deed. Witness never noticed the alteration until he saw

[Schuylkill and Dauphin Improvement Co. *v.* McCreary.]

McCreary have the deed; the alteration was not in the deed when handed to Ayres.

C. Tower testified: He got the deed in 1858 in the office which had been Ayres'; when he got it the date was altered as at trial, in date, receipt and acknowledgment.

The defendants then offered: Warrant of Huntzinger, treasurer of Schuylkill county, to the sheriff dated May 16th 1818, against Joseph Keffer as a defaulting collector of taxes for 1816; return of sheriff, June 17th, that he had "seized all the estate, real and personal," of Keffer, "a tract in Lower Mahantongo containing 200 acres, adjoining lands of —— and others," &c.; warrant of same date from county commissioners to sheriff, returnable July 27th, to collect $259.46 balance due from Keffer, commanding sheriff to sell, &c., a tract &c., "situate in the township of Lower Mahantongo, &c., containing 200 acres, adjoining land of Conrad Fezey, Leonard Rishel, and others." Conditions of sale of same land, dated September 28th 1818, as property of Keffer, signed by John Hammer as purchaser for $175. Deed from sheriff to Hammer of same tract, acknowledged in open court October 30th 1818. Deed September 4th 1819, endorsed on foregoing deed, Hammer to the commissioners of Schuylkill county for $175, "for all his right &c., of the lands &c., in the within deed;" not recorded. This offer was objected to, the evidence received, and the third bill of exceptions sealed. They also offered lease, March 30th 1819, from the county commissioners to Keffer, of the above tract for one year from April 1st 1819 for $12 rent and taxes. The offer was objected to, admitted and the 4th bill of exceptions sealed.

They further gave in evidence deeds of May 24th 1830, from Keffer to Benjamin Becker, Charles Frailey and John Schall, for tract of 175 acres 95 perches, surveyed on Lesher's warrant, one-half to Becker and one-quarter to Frailey and Schall each. Also deed of August 30th 1830, from the commissioners of Schuylkill to same persons in the same proportions, for tract containing 175 acres 95 perches, reciting sheriff's deed to Hammer and Hammer to commissioners; neither of these deeds is recorded. This title by sundry conveyances is vested in the defendants.

They showed land assessed in Mahantongo township, by triennial assessment of 1802, to C. Bartsche, on seated list 400 acres; Lesher on unseated, 400.

1805 Bartsche seated 550 acres; 1807, Keffer substituted for Bartsche, and continued in Keffer's name till 1826, except 1815 and 1816.

1815 is Philip Keehner—Non-residenter, Joseph Keffer, 31 acres.

1816 Philip Keehner.

1831 Non-residenters—Benjamin Becker, 143 a.

1832 to 1847 in Frailey, Schall, Rohrer or one or more of them, 175 acres, unseated.

The defendants gave in evidence a lease from Schall and Rohrer to Samuel Kimmel, dated December 29th 1845, for the land in dispute for two years; also county treasurer's cash-book, showing payments of rent by Keffer for the years 1820, 1821, 1825, 1828 and 1829, of land in Lower Mahantongo, and by F. Spaetzer, in 1825 and 1826. Also, lease from county commissioners to Spaetzer for three years from April 1st 1824.

Christopher Werner testified that his brother George Werner, John N. Bretz and David Lengel lived on the Lesher tract; that while they were living there they told him they were there under Keffer. There was other evidence to the same effect.

The defendants gave much evidence in relation to the possession of the premises by Keffer, and other tenants of the county commissioners and of others under whom the defendants claimed; and also of the possession of Peter Minnich.

The defendants having closed, the plaintiffs made the following application :—

"The defendants having wholly failed to prove that the deed described in their offer as made by John Bartsche, ever was in the possession of Ludwig Schwartz, or that such deeds as are therein recited ever existed, or any alteration in the date of said deed ever was made—the plaintiffs respectfully ask the court to rule out and reject all the evidence of such deed, and the testimony of Frederick Schwartz and Charlemagne Tower in relation thereto."

To which the court answered:—"Christopher Werner and others prove that George Werner, Old Bretz and David Lengel said they held under Keffer, and that Keffer farmed part of the land while they occupied the house. In connection with this, we think the entry and county commissioners' books are evidence of tenancy to go to the jury, and we decline withdrawing the evidence as requested."

To this ruling the plaintiffs excepted, and the 5th bill of exceptions was sealed.

The plaintiffs in rebuttal offered the deposition of John Schwartz, taken at Hanover, York county, before E. G. Scott, Esq., commissioner, January 6th 1864. There were a number of questions asked of the witness, which were leading, and were objected to at the time the deposition was taken.

The admission of the deposition was objected to because, as the defendants alleged, notice of its taking had been served on defendants' counsel, who attended at the time and place; the plaintiffs' counsel was there, and declined to take the deposition; notice was again given that it would be taken before the commissioner; the day before it was taken plaintiffs' counsel took the deposition

before a magistrate without waiting for the commissioner; when defendants' counsel and commissioner arrived, the plaintiffs' counsel laid the deposition thus taken before the witness and requested him to state what he had before stated, to which the defendants' counsel then excepted; it was objected to also on account of the leading questions.

Mr. Scott, the commissioner, certified to the deposition, that it had been taken before him, that "the witness was duly qualified, and subscribed his name to his deposition in my presence at said time and place, and that Jacob Hoffman, Esq., appeared as counsel for the several plaintiffs, and that John Bannan, Esq., appeared as counsel for the several defendants to cross-examine the witness."

The court excluded the answers to the leading questions and admitted the remainder of the deposition, and sealed the 6th bill of exceptions.

The plaintiffs then declined to read any part of the deposition, as it could not be properly understood without the parts excluded by the court.

The plaintiffs further gave evidence from the Court of Quarter Sessions of the grant of tavern license for "house in Lower Mahantongo," for the years from 1831 to 1838, inclusive, to other persons than Keffer.

They also gave in evidence assessments to themselves in Pinegrove township, in the name of John Lesher, 170 acres, from 1843 to 1847, inclusive, and in Tremont township, for 1848; and receipt from county treasurer June 5th 1848, for taxes on John Lesher and other tracts in Pinegrove township for 1845, 1846 and 1847. Also much evidence bearing on the question of the possession of Keffer and others, under whom defendants claimed, and of the plaintiffs themselves and those under whom they claimed.

The plaintiffs submitted twenty-three points, and the defendants twelve.

The points hereinafter specified, with the answers and charge of the court and the opinion of the Supreme Court, will sufficiently exhibit the principles ruled in the case.

Plaintiffs' points: 4. No conveyance by Ludwig Schwartz to Christian Bartsche, as alleged by the defendants, is operative to defeat the conveyance by Schwartz to Snavely in 1837, unless Snavely had notice, actual or constructive, of such prior conveyance; there is no evidence whatever in this case of such notice, and the verdict of the jury must be for the plaintiffs.

Answer: "The facts stated in this point are correct, and the conclusion drawn from them also, unless the defendants have acquired title by the Statute of Limitations."

5. If the jury believe the sheriff's deed to Green determines no boundaries, and is so indescriptive and vague as not

to embrace the Lesher tract, it gives no color of title to the John Lesher survey, and any actual possession taken under it would not extend beyond the actual enclosure, so far as regards the John Lesher tract.

Answer : " This point is correct if the Lesher tract is not included in the boundaries of the land described in the sheriff's deed, and possession taken under that sale and sheriff's deed, on the Lesher tract, would not extend beyond the actual enclosure unless Green or his grantee assumed color of title to the whole tract, as stated in our general charge, by his claiming the whole, having it assessed in his name, &c., in which case his possession would extend to the boundaries of the tract."

6. The sheriff's sale to Green passed but one tract, which under the evidence must be held to include the John Witman survey of 400 acres.

Answer : " The sheriff's deed purports to convey but one tract, ' containing 700 acres, more or less, late the estate of Christian Bartsche.' Whether the Lesher tract is included in the description in the sheriff's deed, is a question of fact for the jury, which they must ascertain from the description in the deed and the location of the tract on the ground."

7. The defendants, to acquire title by the Statute of Limitations, must prove affirmatively that they have had at least twenty-one years of actual, adverse, notorious, hostile and continued possession, either by the same person or by a succession of persons claiming and owning the same right; occupancy or cultivation of the land by different persons, independent of each other, although continued for twenty-one years and upwards, does not give title by the Statute of Limitations.

Answer : " The law is fully and correctly stated in this point."

8. Under the evidence in the cause, the county acquired no title to the land as against those under whom the plaintiffs claim, at the time of the purchase from Hammer and wife, the county could not, by illegal acts foreign to the purpose of its creation as a corporation, acquire title to the John Lesher survey under the Statute of Limitations.

Answer : " We decline to affirm this point. If the sale of this tract by the sheriff for the non-payment of the taxes, as shown by the evidence under the warrant, was valid, the title of Keffer vested in John Hammer; and if Hammer bought for the county, to secure the payment of the taxes, it would be lawful for him to transfer the title so held by him to the. commissioners; and such title would vest in the commissioners officially, or, more properly speaking, in the county; and although the county could not, by illegal acts foreign to the purpose of its creation as a corporation, acquire title to the John Lesher survey

under the Statute of Limitations, yet we hold that the acts by which the title was acquired in this instance were legal."

16. There is no evidence to show that Joseph Keffer, from the time of the sheriff's sale in September 1818, when Hammer purchased, up to 30th March 1819, when he leased from the county, held the land from Hammer, or in any other way than as a defendant in an execution holding on to the premises sold without right, such possession of Keffer would be an independent possession, and the county could not get the benefit of it to set up title by the Statute of Limitations by reason of a lease to Keffer in March 1819, or a purchase from Hammer in September 1819.

Answer: "We give a negative answer to this point. The running of the statute was not broken. Keffer's possession was the possession of the county under the facts attending the sale and lease."

18. If, during any one of the years commencing from the 1st April 1821, and ending April 1st 1824, Joseph Keffer did not occupy or cultivate the land as tenant of the county, and the county had no other possession, the chain of possession under which the defendants claim is wholly broken, and the verdict of the jury must be for the plaintiffs.

Answer: "Affirmed. If the possession was broken and finally suspended, without tenancy or occupancy, for one whole year before the period of twenty-one years' continuous adverse possession elapsed, defendant cannot claim title under the Statute of Limitations."

21. If the jury believe that the defendants' possession was interrupted for the period of a year or more during the twenty-one years claimed, this is fatal to the defendants' claim under the Statute of Limitations, and the defendant has no title to the land in dispute.

Answer: "Affirmed, as to defendants' title under the Statute of Limitations."

Defendant's points: 4. In order to confer title under the Statute of Limitations and to bar the right of the true owner, it is not necessary that there should be actual residence upon the land for the full period of twenty-one years. There may be cultivation without residence, or residence without cultivation, or there may be residence at one time and cultivation at another time, and whether there was a constant residence by Bartsche or Keffer, or those claiming under them, is immaterial, if when there was no person living upon the land, they paid the public taxes, took care of the land, restored the fences, or some of them when down, and kept up the occupation as farmers usually cultivate such land.

Answer: "Affirmed."

6. If Joseph Keffer leased the land from the county commissioners in 1826 for one year, and remained in the possession of

the land by putting other persons in the house upon the tract after that year until he moved to Milton in the spring of 1830; and when it suited his convenience during that time, farmed the land by mowing hay, keeping up some of the fences, so as to show control and possession in him, and did not surrender the possession to the county commissioners, he remained to be the tenant of the county commissioners until they conveyed to C. Fraily, Benjamin Becker and John Schall on the 29th of March 1830, and was bound to pay to the county commissioners the same rent stipulated to be paid by the lease of 1826, and whether he did pay or not, is a matter of no consequence.

Answer: ."Affirmed, if the tenant held over, and continued in the. possession. The tenancy continued whether he paid the rent or not."

8. The recital in the deed from Bartsche to Ludwig Schwartz, and the receipt of the deed by him, is conclusive evidence that Ludwig Schwartz did convey the land in question to Christian Bartsche, as stated in the recital on the 6th day of December 1803, and fixed the title in Bartsche at that time, and if Bartsche was in the possession of the land under it, and it being ·taxed to him as his land, he had title and possession, which was transmitted to Green by the sheriff's sale in 1807, and by him to Keffer, and Ludwig Schwartz had no title to convey to Snavely in 1837, and acquired none by the conveyance of John Bartsche to him, because, before the actual date of the deed from Christian Bartsche to John Bartsche, there was a judgment obtained against him by George Burkhard, to wit, on the 26th of April 1806, for 93*l.* 13*s.* 5*d.*, to pay which the property in question was sold to William Green as the property of Christian Bartsche, who conveyed the same to Joseph Keffer by agreement of the 24th of .February 1807, and by deed of the 24th of October 1810.

Answer: "This point is correct so far as Ludwig·Schwartz is concerned. Such title acquired by Green would be good against. Schwartz and his heirs; but the deed from Schwartz to Christian Bartsche not having been recorded, is not evidence against a bonâ fide purchaser from Schwartz without a notice of its existence, and if plaintiffs were such purchaser they would not be affected by it."

. 9. If the occupation of Bartsche and those claiming under him was effective to give title under the Statute of Limitations, the non-record of the deed from Schwartz to Bartsche can have no effect, as such a possession is equivalent to a recorded title.

Answer: "Affirmed."

10. The plaintiffs are bound to take notice of any matter existing in the line of their own title, and John Snavely was.affected with notice of the deeds made by Ludwig Schwartz .to..Christian Bartsche, and the deed to John Bartsche by C. Bartsche, and the

deed from John Bartsche to Ludwig Schwartz, and it was not necessary for these deeds to be upon record to affect him with notice of their existence when he purchased in 1837, and they, in connection with the sheriff's sale to Green, showed Snavely that there was no title in Ludwig Schwartz when he so purchased.

Answer: " The plaintiffs are bound to take notice of any matter in the line of their own proper title. If the plaintiffs claim under the unrecorded deeds, they are in the line of his title. But if they do not claim under them, they are not in the line of his title. And notice of a prior unrecorded deed from the same grantor must be brought home to a party, to be affected by it. The sheriff's sale to Green would not be such notice as the law requires."

13. County commissioners are bound to protect the interests of the county, and it is their duty to purchase lands sold on their process, to collect balances due from tax collectors if necessary to secure payment of taxes; and if John Hammer purchased the land in question as the land of Joseph Keffer to save the debt due from Keffer to the county, and did convey it to the county, and thereby did save the county debt, and the proceedings were acquiesced in and agreed to by Keffer, the possession of Keffer was by such process transferred to the county, and third parties claiming in hostility, and not under Keffer, cannot object to the process or title of the county.

Answer: " Affirmed."

The court, after speaking of the paper titles of the respective parties, charged :—

" The second ground on which the defendants claim title, is by and under the Statute of Limitations.

" In Pennsylvania a perfect and indefeasible title to lands may be acquired under our Statute of Limitations. But in order to acquire such title it is necessary that the disseisor occupancy should be kept up for a period of twenty-one years.

" The effect of such occupancy during the statutory period is such, that the statute may be said to transfer to the occupant disseisor; the title against which the statute has run.

" This was so held in Grafius v. Tottenham, 1 W. & S. 494.

" The question here arises as to what kind of occupancy or possession is necessary to be kept up to acquire title under and by virtue of the statute. And first as to the quantity of land that may be so held, and title to the same acquired by the statute, we remark that when the occupant enters upon the land, under color of title, which defines the boundaries ; he will hold by the boundaries thus defined, although he may have cultivated but a small portion of his tract.

" Second. When the occupant is an intruder, enters into the lands of another without right or color of title, and does not

[Schuylkill and Dauphin Improvement Co. *v.* McCreary.]

make or define his boundaries on the ground, he can acquire title by the statute only to what he actually improves by cultivation.

"What kind of occupancy does the law require to give title under the statute? The statute begins to run at the time adverse possession is actually taken by the occupier. It has been decided by our Supreme Court that "one who enters on land as a trespasser, clears it and builds a house, and lives in it, acquires something which he may transfer by deed or descent, and if the possession of such person, and others claiming under him, added together amount to twenty-one years, and were adverse to him who had the legal title, the statute is a bar to a recovery. But in order to give title under the statute, the possession of a claimant cannot be tacked to that of a former possessor under whom the party does not show title. The possession must be adverse. It must be actual, visible, exclusive and notorious, continuous and uninterrupted. But actual residence is not necessary, nor payment of taxes.

"A mere intruder, as we stated to you, does not ordinarily acquire title to more than he actually cultivates, but he may assume color of title by declarations and acts evincing an uninterrupted purpose to hold the whole tract; or by having the whole assessed in his name and payment of taxes for twenty-one years, when the owner had paid no taxes.

"The requisites necessary to obtain a title under the Statute of Limitations, have been often enumerated and repeated by our Supreme Court. In Groft *et al. v.* Weakland *et al.*, 10 Casey 304, it was said "every element in the definition of what constitutes a title by adverse possession must exist, or the possession will not confer title under the Statute of Limitations.'

"'The fact of possession is for the jury, but whether the kind, and length of that possession is such as to give title under the Statute of Limitations is a matter of law for the court, *and it is proper for the court to instruct the jury, that an interruption in the plaintiff's possession for a year would be a bar to his claim under the statute.*'

"Again, 7 Casey 279, 'when a person claims under the Statute of Limitations, if the evidence does not exhibit an actual, adverse, visible, notorious, hostile and continued possession, there is not a case for the jury.

"The fact of possession and occupancy of the defendants, and those under whom they claim is for the jury. The length of time which the defendants claim to have thus occupied this Lesher tract of land from the time of the first adverse entry upon it, by those under whom the defendants claim, as early, as they allege, as 1805, and from that down to about the year 1833, would be sufficient to give title by the Statute of Limitations. And the

[Schuylkill and Dauphin Improvement Co. *v.* McCreary.]

main question for the jury is whether the defendants or those under whom they claim, were in the possession and continuous occupancy of this tract of land for the period of twenty-one years, from the date of such adverse entry, and prior to 1833, and if the jury are satisfied from the evidence that the defendants did have such continuous possession, their verdict should be in favor of the defendant.

" The burden of the proof of this fact is thrown upon the defendants, and it must be of such kind or character for strength and certainty, as to convince the mind or conscience of the jury."

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

The verdict was for the defendants, and the plaintiffs took a writ of error.

The assignments of error were the several bills of exception, the answers to the points and the charge as given above.

*J. Ryan* and *F. W. Hughes* (with whom were *J. Hoffman* and *E. J. Fox*), for plaintiffs in error.—The whole record must be produced: James *v.* Starkey, 1 W. C. C. R. 330. Some interest must be shown in a grantor before his deed can be evidence: Faulkner *v.* Eddy, 1 Binn. 188; Hoak *v.* Long, 10 S. & R. 9; Kennedy *v.* Skeer, 3 Watts 95. As to the recitals in the deed: Meals *v.* Brandon, 4 Harris 225; Dean *v.* Connelly, 6 Barr 239; Lloyd *v.* Lynch, 4 Casey 424.

As to the evidence of the proceedings under the treasurer's warrant, &c.: Acts of April 11th 1799, §§ 18, 19, 20, 3 Sm. L. 398, 399, Purd. 939, 940, pl. 48, 49, 50; April 3d 1804 (Unseated Lands), § 2, 4 Sm. L. 201; Wistar *v.* Kammerer, 2 Yeates 100; Young *v.* Martin, Id. 312; Birch *v.* Fisher, 13 S. & R. 208; Cash *v.* Tozer, 1 W. & S. 519; Shields *v.* Miltenberger, 2 Harris 79; Porter *v.* Neelan, 4 Yeates 108; Burd *v.* Dansdale, 2 Binn. 80; Vankirk *v.* Clark, 16 S. & R. 290. As to the lease from the county to Keffer and its effect: Bedford *v.* McElherron, 2 S. & R. 50; Logan *v.* Herron, 8 S. & R. 459; Hemphill *v.* Flynn, 2 Barr 144; De Haven *v.* Landell, 7 Casey 120.

*T. R. Bannan* and *O. H. Meyers* (with whom was *C. Tower*), for defendants in error.—Recitals are evidence against parties and privies: Meals *v.* Brandon, *supra.* Excluding evidence not affecting the party is not error: Evans *v.* See, 11 Harris 88; Lacy *v.* Arnett, 9 Casey 169; Hays *v.* Pitts'g. and Steub. Railr., 2 Wright 81. A deed may be delivered to a stranger for the use of the grantee without his precedent authority: Eyrick *v.* Hetrick, 1 Harris 494. Snavely was bound to know from tenants of the land how they came into possession: Green *v.* Drinker, 7 W. & S. 440; Cresson *v.* Miller, 2 Watts 275; Boggs *v.* Varney, 6 W. & S. 474.

The opinion of the court was delivered, July 2d 1868, by

THOMPSON, C. J.—Of the twenty-nine assignments of error we have on this record, I shall confine my attention almost exclusively to those embraced by the oral argument of the counsel for the plaintiffs in error; not regarding any of them as having been abandoned, however, but because after a careful examination of them, I am not able to discover any grounds to suspect error in the ruling of the learned judge below in regard to them, or which requires discussion.

1. The exemplification of the record from Berks county, received in evidence, which is the first specification of error, was undoubtedly admissible by force of the certificate under the seal of the court that it was as full and entire a copy as remained of record in the office: 3 S. & R. 135; 16 Id. 106; 7 W. & S. 211, and 11 Casey 111. It was evidence; and if there remained a doubt of its effect in the shape it was received, the court should have been requested to charge upon that. This assignment of error is therefore not sustained.

2. The 2d specification of error is to the admission in evidence of a deed from John Bartsche to Ludwig Schwartz, dated August 14th 1806, and the answers of the court in connection therewith to the 8th and 10th points of the defendants.

There is no doubt, both of the relevancy and admissibility of the deed, if there was sufficient evidence of its delivery, or if it was proposed to be followed by such testimony. This was undoubtedly the offer, and the court could not reject it. It was a step towards showing the foundation of the title to the plaintiffs, as also that of the defendants. When it was offered, no court would in that stage have been justified in rejecting it. It was regularly executed to Ludwig Schwartz by John Bartsche, acknowledged and attested as "signed, sealed and delivered" to the grantee, and was in his agent's possession when the latter contracted to sell the land to Snavely. Its acceptance by Ludwig Schwartz, made its recitals evidence against him. This was important as a step to show that Snavely knew, and had notice that the land was bound by a judgment against Christian Bartsche, when the latter conveyed to John Bartsche. That the testimony did not establish notice of this deed to Snavely, was no reason why evidence preparatory to the proof of that fact should not be received.

But the effect of the testimony was decided by the learned judge in answer to the plaintiffs' 4th point. The court there ruled, without qualification, that there was no evidence of notice to Snavely, and consequently none to affect his grantees, and that so far as this deed was concerned, the plaintiffs were entitled to recover, unless the defendants had title by the Statute of Limitations. This threw out of view all testimony on the point, in

[Schuylkill and Dauphin Improvement Co. *v.* McCreary.]

regard to which the deed was offered and received, and placed the controversy on the question of the Statute of Limitations alone.

The answer of the court to the defendants' 8th point was exactly right, and what the plaintiffs cannot complain of. It conceded full effect to the recitals in the deed as against Ludwig Schwartz, but not as against a bonâ fide purchaser from him, the deed not having been recorded. This did the plaintiffs no harm that we can see, if, as they contended, no such notice was proved to Snavely; and this the court held to be the case in answer to the plaintiffs' 4th point, as already noticed. The answer to the defendants' 10th point, which had relation to the effect of this deed to Ludwig Schwartz, just as carefully guarded its effect on third parties without notice, as did the answer to the 8th point. For these reasons we see no error either in the reception of the testimony under the accompanying offer, nor in the answers of the court to the 8th and 10th points of defendants.

3. The next thing to be considered is the 3d specification of error, and it involves the validity of the seizure and sale of the land in controversy as the property of Joseph Keffer, a defaulting collector. Keffer was a purchaser of the land from Green; Green had purchased it at sheriff's sale, as the property of Christian Bartsche, who, it was alleged, had purchased from Ludwig Schwartz, as the last-mentioned deed showed. This was Keffer's title.

The objection of the plaintiffs to the testimony, the subject of this specification, seems, in part at least, to be founded in misapprehension. It was not a sale of land for taxes, which passed Keffer's title. It was a sale, pursuant to the Act of the 11th April 1799, on process against a defaulting collector. The sale was made by the sheriff on a warrant issued, pursuant to the act, by the county commissioners, for a debt due the county; and the law regulating the sale of unseated lands for taxes had nothing to do with it whatever. The authorities cited by the plaintiffs in error, relate to such sales, and are irrelevant to the question before us.

The objection that the sheriff did not sell on the day mentioned in the warrant, is not sustained by the citation of authorities to prove that a sale made after the return-day of a writ is void. This warrant had no return-day, and it was valid and effectual as long as the commissioners might choose, notwithstanding a day was mentioned for its execution. The officer was simply the agent of the commissioners in making the sale. Besides this, nobody but Keffer could take advantage of it, if it were an irregularity. It was nothing more, certainly. Nor of any supposed insufficiency of description. Nor does it matter in this issue whether Hammer, who purchased the tract, was treasurer or not, provided he bought it in for the county, and the commissioners recognised his act for the benefit of the county, and took his deed to themselves for the county. The conditions of sale were, as between these parties,

[Schuylkill and Dauphin Improvement Co. *v.* McCreary.]

not of the smallest consequence, after acknowledgment in court by the sheriff of the deed to the purchasers without objection on the part of the defendants.  We think the county having thus become the proprietor of the land, it could lease or sell it at pleasure, and that the deed of the commissioners to Becker and others, was not void for want of authority to sell.  The right to order the sale of land to secure the county against a loss of taxes collected, necessarily implies the right to do everything else necessary to render the security effectual.  The commissioners could levy, or authorize an agent to levy, and if the county could thus acquire, it ought certainly to be able to dispose of property so acquired, or the right would be worthless.  The right exists under circumstances like these, *ex necessitate rei*.  Northampton County's Appeal, 6 Casey 305, makes valid acts of county commissioners against the objection of strangers to the transaction.  But I regard Vankirk *v.* Clark & Graham, 16 S. & R. 286, as entirely conclusive, as to the power of the commissioners in this case, to purchase and sell the property to secure the debt due the county.  I cite the case without quoting from it.  It covers in principle the entire ground of this objection.  In this view it is scarcely worth while to allude to, or invoke the effect of the acceptance of a lease from the county by Keffer, of the land seized and sold as his, for his default as collector.  This was a waiver of objections on his part to irregularities, if any; and no stranger to the proceedings could make any.

4. I may notice here the assignment of error to the answer of the court to the defendants' 6th point.  The answer affirmed as law what it seems difficult to raise a doubt of, viz., that a tenant holding over, after the expiration of his lease, continues tenant.  He undoubtedly does, and his possession is the possession of the lessor, with like effect as possessed by the lessee, so far as the Statute of Limitations is concerned.  This is so directly the result of fixed legal principles, that authorities are not needed to prove it.  There was no error in the assignment.

5. The next error which we shall notice, is that assigned to the rejection of parts of the deposition of John Schwartz.  It seems to us the court would have been justifiable in refusing the deposition altogether, had the objection to the manner in which it was alleged to have been taken been established.  It is certainly objectionable, and seriously so, to take the deposition of the witness the day before the time appointed in the rule, in the absence of the other side, and then produce it before the witness and examine him from it.  I presume, however, it was not excluded on that ground, because the proof of the fact was not sufficient.

The most material parts of the deposition were admitted, and those parts rejected upon special objections, constitute the exception and assignment of error.  It is sufficient to say of these, after

a careful examination, that we think the court was entirely right in sustaining the objections. Objection having been made to the questions at the time they were propounded, and so noted when the deposition was taken, this should have put counsel on their guard against asking leading questions. It had not that effect, and if any injury has ensued to the plaintiffs from the ruling of the court, it is neither the fault of the law, the court nor defendants' counsel. We think the court committed no error in the matter of this specification.

The charge and answers of the court to points relating to the possession necessary to make title under the Statute of Limitations, have been examined. Whether it was upon the land in question, whether adverse, notorious and continuous for twenty-one years, were all questions for the jury, and properly submitted to them upon evidence, the sufficiency of which was necessarily for them, and their action is not before us for review.

The answer of the court to the plaintiffs' 18th point, complained of as error, was in exact accordance with the point. The point was, "That if during any one of the years, commencing from the 1st of April 1821, and ending April 1st 1824, Joseph Keffer did not occupy or cultivate the land as tenant for the county, and the county had no other possession, the chain of possession under which the defendants claim is wholly broken, and the verdict of the jury must be for the plaintiffs." The point, on its face, as well as on the position assumed by the counsel for the plaintiffs in another part of the case, which we have noticed, was predicated of the idea that if Keffer occupied the premises during either of the years between 1821 and 1824, but without a lease from the county, the possession of the county as a proprietor was not continued. Hence the language "if during any one of the years between 1821 and 1824." The answer is, "Affirmed. If the possession was broken and finally suspended, *without tenancy* or occupancy, for one whole year before the period of twenty-one years' continuous adverse possession elapsed, defendants cannot claim title under the Statute of Limitations." This was a direct answer to what was asked, in view to the question of tenancy. It was not possible for the jury to have understood the court, that in order to break the continuity of possession, so as to defeat the statute, a whole year's dereliction of possession must have occurred; for the learned judge had not only told the jury that the main question, in order to make title under the statute, was whether there had been " a continuous occupancy of the tract of land for the period of twenty-one years," and had on this subject not only stated the necessity for *continuous* occupancy for that period, but referred to the requisites to be found stated in Groft v. Weakland, 10 Casey 304, in which uninterrupted continuous possession as a requisite, is distinctly asserted. If the

answer misled the jury at all, which I cannot believe, it is chargeable to the point. The answer was right.

We see nothing in the record which requires correction;

And the judgment below is affirmed.